```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                          20-CR-182(VEC)

 5   JONATHAN BURGOS,

 6               Defendant.

 7   ------------------------------x
                                          Hearing
 8
                                          New York, N.Y.
 9                                        May 6, 2021
10                                        10:00 a.m.

11
     Before:
12
                         HON. VALERIE E. CAPRONI,
13
                                          District Judge
14

15                       APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     DINA MCLEOD
18   JULIANA MURRAY
          Assistant United States Attorney
19
     RUHNKE & BARRETT
20        Attorneys for Defendant
     DAVID A. RUHNKE
21   DIANE FERRONE

22   Also present: Detective Lee Arroyo, NYPD

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1                    (In open court; case called)

2                    THE DEPUTY CLERK:  Counsel, please state their

3       appearance for the record.

4                    MS. MURRAY:  Good morning, your Honor.  Juliana Murray

5       and Dina McLeod for the United States.

6                    THE COURT:  Good morning.

7                    MR. RUHNKE:  Good morning, your Honor.  David Ruhnke

8       appearing with Mr. Burgos, who is standing to my left, and

9       assisted by associate counsel Diane Ferrone, who is also

10      appearing this morning.

11                   THE COURT:  Good morning, everybody.

12                   Good morning, Mr. Burgos.

13                   THE DEFENDANT:  Good morning, your Honor.

14                   THE COURT:  Are we ready to start?

15                   MS. MURRAY:  Yes, your Honor.

16                   MR. RUHNKE:  Your Honor, as a housekeeping matter, we

17      stipulated admissibility of the exhibits that have been

18      premarked by both sides.

19                   THE COURT:  Good.  That will speed things up.

20                   Before we get started, Mr. Burgos, Congress has passed

21      a law that requires me the first time I see a defendant, and

22      this is the first time I have seen you since the law changed,

23      to remind the government of its obligation under the

24      Constitution.  Let me turn to that and then we'll turn to the

25      suppression hearing.
```

```
 1              Okay?

 2              THE DEFENDANT:  Not a problem.

 3              THE COURT:  I direct the prosecution to comply with

 4    its obligation under Brady v. Maryland and its progeny to

 5    disclose to defense all information that is admissible or not,

 6    that is favorable to the defendant, material either to guilt or

 7    to punishment, and known to the prosecution.  Possible

 8    consequences for noncompliance may include dismissal of

 9    individual charges or the entire case, exclusion of evidence,

10    and professional discipline or court sanctions on the attorneys

11    responsible.  I have previously entered a written order more

12    fully describing this and the possible consequences of failing

13    to meet it, and I direct the prosecution to review and to

14    comply with that order.

15              Ms. Murray, do you confirm that you understand your

16    obligations and will fulfill them?

17              MS. MURRAY:  Yes, your Honor.

18              THE COURT:  Okay.  Hang on one second.  I am not quite

19    set up here.

20              Call your first witness, Ms. Murray.

21              MS. MURRAY:  Yes, your Honor.  The government calls

22    Detective Lee Arroyo.

23              THE COURT:  Detective.

24              THE DEPUTY CLERK:  Raise your right hand.

25     LEE ARROYO,
```

L566burH                         Arroyo - direct

1          called as a witness by the Government,

2          having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MS. MURRAY:

5    Q.   Good morning, Detective Arroyo.

6    A.   Good morning.

7    Q.   What do you do for work?

8    A.   I am a New York City police detective.

9    Q.   How long have you worked for the New York City Police

10   Department?

11   A.   10 years.

12   Q.   What is your title?

13   A.   Detective.

14          THE COURT:  Hang on a second.  Let's see if we can get

15   the mics turned up a little bit.

16          MS. MURRAY:  I can hear the detective.

17          THE COURT:  You can hear him, but he is having trouble

18   hearing you.

19   Q.   Can you hear me now?

20   A.   Yes.

21   Q.   Are you assigned to a particular squad at the NYPD?

22   A.   Yes.

23   Q.   What squad is that?

24   A.   Bronx Overdose Squad.

25   Q.   How long have you been assigned to that squad?

L566burH                          Arroyo - direct

1    A.   Three years.

2    Q.   What are your specific duties and responsibilities as a

3    detective with the Bronx Overdose Squad?

4    A.   To investigate nonfatal and fatal drug overdoses.

5    Q.   While you worked for the NYPD, approximately how many

6    investigations have you participated in?

7    A.   Over 100.

8    Q.   What types of investigations have you participated in?

9    A.   Drug conspiracy, violence, and drug overdoses.

10   Q.   Turning your attention to March 2019, were you

11   investigating individuals you believed were selling cocaine in

12   or around Clason Point Housing in the Soundview neighborhood of

13   the Bronx?

14   A.   Yes.

15   Q.   What prompted that investigation?

16   A.   Yes.  We received notification from the 43rd precinct,

17   which is in the south section of the Bronx, and they responded

18   to a possible double fatal drug overdose.

19   Q.   Did there come a time when you learned the cause of death

20   of those two overdose victims?

21   A.   Yes.

22   Q.   What was the cause of death?

23   A.   Intoxication of cocaine and Fentanyl.

24   Q.   Describe the investigative steps that you took when you

25   arrived at the scene of those overdose deaths.

L566burH                    Arroyo - direct

1   A.  The steps that we take are primarily investigation --

2            MR. RUHNKE:  Your Honor, I am having trouble hearing

3   the detective.  Can he speak up just a little?

4            THE COURT:  Is there a way to turn up the volume?

5   A.  During the preliminary investigation we are responsible for

6   ascertaining information from witnesses, reports, video

7   canvasses, the search for narcotics, and the recovery of cell

8   phones of the victims.

9   Q.  At the scene of that double overdose death what, if

10  anything, did you recover from the scene?

11  A.  I recovered two cell phones from both victims.

12            THE COURT:  Two from each or two total?

13            THE WITNESS:  Two total.

14  Q.  To be clear, one cell phone from each of the overdose

15  victims?

16  A.  Yes.

17  Q.  Did there come a time when you searched the contents of the

18  victims' cell phones?

19  A.  Yes.

20  Q.  What, if anything, did you find on the victims' cell phones

21  that was relevant to your investigation?

22  A.  During my search into one of the cell phones that belonged

23  to the victim, Joell.  I was able to look at two text messages

24  from two individuals.  One that goes by the name of John Boy

25  and the other one goes by the name of Ty Black.

L566burH                      Arroyo - direct

1          THE COURT:  Sorry.  Can you give me those two names

2    again?

3          THE WITNESS:  John Boy.

4          MR. RUHNKE:  I didn't hear that either.  John?

5          THE COURT:  Boy.

6    A.  The second text messages were from an individual named Ty

7    Black.  T-y, space, Black.

8    Q.  During your investigation, did there come a time when you

9    were able to determine who the John Boy was?

10   A.  Yes.

11   Q.  How were you able to determine that?

12   A.  In the cell phone they had a friendship.  During the text

13   messages in the cell phone, they had a friendship.  A friendly

14   relationship.

15   Q.  Were you able to identify any actual individual who was

16   using the cell phone number that was listed as John Boy?

17   A.  Yes.

18   Q.  How were you able to determine that?

19   A.  I was able to determine that by speaking with the mother of

20   the victims.

21   Q.  What, if anything, did she tell you about the phone number

22   that was attributed to John Boy?

23   A.  She stated that her son and John Boy were close friends.

24   Q.  What, if anything, did she tell you about the true identify

25   of John Boy?

L566burH                              Arroyo - direct

1   A.   About who he is?

2   Q.   Correct.

3   A.   Yes.  She stated his name is Jonathan -- Jonathan Burgos.

4            THE COURT:  Jonathan what?

5            THE WITNESS:  Jonathan Burgos.

6            THE COURT:  Okay.

7   Q.   During your investigation into the overdose deaths, did you

8   conduct any interviews with the 911 caller?

9   A.   Yes.

10  Q.   Who was that person?

11  A.   Bobby Ramos.

12  Q.   What, if anything, did you learn from the initial interview

13  with Bobby Ramos that was relevant to your investigation?

14  A.   Bobby Ramos, during the initial investigation, he was sort

15  of cooperative.  The only thing he stated was that the victims

16  were using cocaine.

17  Q.   Did there come a time when you interviewed Ramos again?

18  A.   Yes.

19  Q.   Approximately when was that second interview?

20  A.   A few months later.

21  Q.   What, if anything, did you learn from the second interview

22  of Ramos that was relevant to your investigation?

23  A.   Bobby Ramos told me that the day of the incident that he

24  received money from Joell and was instructed to purchase

25  narcotics from -- cocaine from an individual named Ty, whose

L566burH                     Arroyo - direct

1   real name is Tyrone Howard.

2   Q.  What, if anything, did Bobby Ramos tell you during that

3   investigation during your interview into Jonathan Burgos?

4   A.  He stated that during the day of the incident when both

5   victims were unresponsive and unconscious, he stated that he --

6   the first thing he did was call Jonathan, and moments later

7   Jonathan came to the apartment to where the two individuals

8   were unresponsive, walked to a safe and he said that he

9   observed him removing money and drugs and then told Bobby that

10  *I wasn't here*, and walked away.

11          MS. MURRAY:  Your Honor, as defense counsel indicated,

12  we have had agreed to the admissibility of exhibits.  That is

13  Government Exhibits 1 through 9 and Defense Exhibits 1 through

14  6.  So we would offer those into evidence at this time.

15          THE COURT:  All the exhibits are received.

16          (Government's Exhibits 1 - 9 received in evidence)

17          (Defendant's Exhibits 1-6 received in evidence)

18          MR. RUHNKE:  Agreed, your Honor.

19          MS. MURRAY:  Mr. Rosenburg, can you please publish

20  what has been admitted as Government Exhibit 5.

21  BY MS. MURRAY:

22  Q.  Detective Arroyo, do you recognize this?

23  A.  Yes.

24  Q.  What does this show?

25  A.  It shows an aerial view of the South Bronx section.

L566burH                    Arroyo - direct

1   Q.  Can you identify for us the approximate location on this

2   map of the scene of the double overdose deaths?

3   A.  Yes.  It's on the left side of the map.

4   Q.  Can you describe the intersection or cross-street of that

5   approximate area?

6   A.  Lafayette and Noble Avenue.

7            THE COURT:  And what?

8            THE WITNESS:  After Lafayette.  That is

9   L-a-f-a-y-e-t-t-e, Avenue.  And Noble, N-o-b-l-e.

10  Q.  Is that the top left of the map where there is a little

11  circular street that says Clason Point Lane; is that the

12  approximate area?

13  A.  Yes.

14           MS. MURRAY:  Mr. Rosenburg, you can take that down.

15  Q.  Detective Arroyo, did there come a time when you began to

16  investigate Tyrone Howard and others for selling cocaine?

17  A.  Yes.

18  Q.  Approximately when did that investigation occur?

19  A.  A few weeks later.

20           THE COURT:  A few weeks after the deaths, or second

21  interview with Bobby Ramos?

22           THE WITNESS:  Yes.

23           THE COURT:  You can't answer that yes.

24           THE WITNESS:  I couldn't hear what you said.

25           THE COURT:  Was it shortly after the deaths, or

L566burH                          Arroyo - direct

1    shortly after the second interview with Bobby Ramos?

2                THE WITNESS:  It was shortly after the deaths.

3                THE COURT:  Okay.

4    BY MS. MURRAY:

5    Q.  Did that investigation focus on a particular neighborhood?

6    A.  Yes.

7    Q.  What neighborhood is that?

8    A.  Lafayette, Noble Avenue and Story Avenue and also Soundview

9    Avenue.

10   Q.  Is that in the approximate vicinity of the location of the

11   overdose deaths?

12   A.  Correct.

13   Q.  During your investigation, did you use undercover officers

14   or UCs?

15   A.  Yes.

16   Q.  How did you use the undercover officers?

17   A.  The undercovers are assigned to the Bronx Overdose Squad to

18   investigate and to ascertain information and also to conduct

19   controlled buy operations from individuals who have some kind

20   of connection to the victims.

21   Q.  Did undercover officers purchase narcotics from members of

22   a crew in this investigation?

23   A.  Yes.

24   Q.  What kind of narcotics did the undercover officers

25   purchase?

L566burH                    Arroyo - direct

1   A.  Cocaine.

2   Q.  Did you use a confidential informant, or CI, in the course

3   of the investigation?

4   A.  Yes.

5   Q.  How did you use the CI?

6   A.  The CI was used for information.

7   Q.  What kind of information did the CI provide that was

8   relevant to your investigation?

9   A.  The CI provided me with information about Jonathan Burgos's

10  vehicles, what he does for a living.  He provided that he works

11  for a male named Vernon, who is a super for an outdoor mall.

12  He stated -- the CI stated also that Jonathan Burgos was in

13  charge of the majority of the cocaine that was being sold in

14  the area.  The CI stated that Jonathan had a close relationship

15  with Joell.  The CI stated that Joell owed Jonathan money.  The

16  CI stated that Jonathan has a girlfriend named Rachel.

17  Q.  You mentioned vehicles.  What, if anything, did the CI

18  state about the vehicles that Jonathan Burgos used?

19  A.  The CI stated that Jonathan operates the white van, a white

20  box truck.  He also owns an ice cream truck and an older model

21  box truck.  I believe it was yellow and orange in color and

22  they were usually parked on Noble Avenue, Soundview Avenue.

23          THE COURT:  Sorry.  This is not your fault, but the

24  sound system here is terrible.  Tell me again what vehicles the

25  informant said were associated with Burgos.

L566burH                          Arroyo – direct

1              THE WITNESS:  Correct.  It is going to be a white ice

2    cream truck.

3              THE COURT:  A white SUV?

4              THE WITNESS:  Ice cream truck.

5              THE COURT:  White ice cream truck?

6              THE WITNESS:  White mini work van.

7              THE COURT:  A white work van.

8              THE WITNESS:  A white box truck.

9              THE COURT:  A what?

10             THE WITNESS:  Box truck.

11             THE COURT:  So three white vehicles -- a work van, an

12   ice cream truck, and a box van?

13             THE WITNESS:  Yes.

14             MS. MURRAY:  A box truck.

15             THE COURT:  A box truck.

16   BY MS. MURRAY:

17   Q.  Detective Arroyo, during the investigation, did you observe

18   the defendant driving multiple vehicles?

19   A.  Yes.

20   Q.  What vehicles did you observe the defendant driving?

21   A.  I observed him driving in the white van, work van.  I

22   observed him driving in a white box truck.  I also observed him

23   driving in a black MDX Acura and also a Nissan.

24   Q.  What color was the Nissan?

25   A.  Gray.

L566burH                          Arroyo - direct

1          THE COURT:  What color?

2          THE WITNESS:  Gray.

3   Q.  Where did the defendant park the vehicles that you observed

4   him driving?

5   A.  The majority of the time they were parked on Noble Avenue

6   and inside of a parking lot on Soundview Avenue.

7          MS. MURRAY:  Mr. Rosenburg, can you publish what has

8   been admitted as Government Exhibit 6.

9   Q.  Detective Arroyo, do you recognize this?

10  A.  Yes.

11  Q.  What is this a photograph of?

12  A.  This is a photograph of a parking lot on Soundview Avenue.

13          Parking lot on Soundview Avenue.

14  Q.  Is this the parking lot that you referred to that Jonathan

15  used to park vehicles?

16  A.  Yes.

17  Q.  Now, taking a look at this photograph, did you observe the

18  defendant driving any of the vehicles in this photograph?

19  A.  Yes.

20  Q.  Which vehicle?

21  A.  The white van to your far left.  And far right behind those

22  bushes there is the black Accura.

23  Q.  Detective Arroyo, in this photo, does it appear there is a

24  license plate on the back of that white van?

25  A.  No.

1          MS. MURRAY:   Thank you, Mr. Rosenburg.   You can take

2    that down.

3    Q.   During the course of your investigation, did you run

4    registrations of any of the vehicles you observed the defendant

5    driving?

6    A.   Yes.

7    Q.   Do you have a specific recollection of running any vehicle

8    registrations in a law enforcement databases?

9    A.   Yes.

10   Q.   What were the results of the vehicle registration checks

11   that you recall having conducted?

12   A.   I conducted a check for the Nissan, which returned to a

13   woman named Rachel Ocasio.

14          THE COURT:   Spell the last name.

15          THE WITNESS:   O-c-a-i-s-o.

16          MR. RUHNKE:   For the record it is O-c-a-s-i-o, Ocasio.

17   Q.   Detective Arroyo, you said that the Nissan was registered

18   to Rachel Ocasio; is that correct?

19   A.   Yes.

20   Q.   Did you determine the registration of any of the other

21   vehicles that you observed John Burgos driving?

22   A.   Yes.

23   Q.   Which vehicle?

24   A.   Box truck.

25   Q.   What color is that box truck?

1   A.  White.

2   Q.  Who was that box truck registered to?

3   A.  The same woman, Rachel.

4   Q.  Did there come a time when you learned whether Rachel

5   Ocasio was affiliated with any of the subjects of your

6   investigation?

7   A.  Yes.

8   Q.  How did you learn that?

9   A.  The CI.

10  Q.  What did you learn?

11  A.  The CI stated that Rachel is the girlfriend to Jonathan

12  Burgos.

13  Q.  Detective Arroyo, what, if anything, do you recall about

14  whether there were license plates on the other vehicles you

15  observed Jonathan Burgos driving?

16  A.  Yes.

17  Q.  What do you recall?

18  A.  I recall the CI mentioning that Jonathan uses a lot of

19  temporary plates on his vehicles.

20  Q.  Based on your training and experience, what, if anything,

21  do you know about temporary license plates that is relevant to

22  registration searches?

23  A.  The majority of them are unable to be run on our New York

24  City Police Department database, which end result comes back to

25  no results.

L566burH                    Arroyo - direct

1    Q.   Detective Arroyo, turning your attention to September 13th,

2    2019, did an undercover drug purchase occur on that day?

3    A.   Yes.

4    Q.   Approximately where did that purchase take place?

5    A.   Lafayette and Noble Avenue.

6              THE COURT:  Hang on one second.  One thing that will

7    make it better is for you to stay back off the microphone.

8              THE WITNESS:  Okay.

9              THE COURT:  Speak up nice and loud, but don't lean

10   into the microphone.

11             THE WITNESS:  Okay.  Sorry, Judge.

12             THE COURT:  That's okay.

13   BY MS. MURRAY:

14   Q.   Detective Arroyo, what involvement, if any, did you have in

15   that September 13th controlled buy?

16   A.   I was assigned ghost.

17   Q.   Can you describe what you mean by ghost?

18   A.   A ghost is responsible to make sure that the undercover is

19   safe and also to -- basically you are the eyes and ears to the

20   field team and you are providing information as the case -- as

21   the operation is going to the team and making sure everything

22   is going as smooth as possible.  Following the money.  You

23   know, observing where the subject is going to purchase the

24   drugs and who is he speaking to at the time and to gather all

25   that information.

L566burH                         Arroyo - direct

1   Q.   Now, on September 13th, 2019, while you were ghosting, were

2   you able to observe the buy that took place?

3   A.   Yes.

4   Q.   Describe what you observed?

5   A.   So the -- the undercover made contact with Bobby Ramos and

6   they agreed on purchasing narcotics, the undercover was

7   observed on Lafayette Avenue where he -- moments later Bobby

8   Ramos exited the building where the victims were found.  I

9   observed them engage in a drug-related conversation.  Moments

10  later the undercover gave a signal stating that he gave the

11  money to Ramos, at which point I observed Bobby walking to the

12  corner of Lafayette and Noble Avenue.  He turns right on Noble,

13  walks down Noble towards Story Avenue.  Towards the middle of

14  that block, I observed a few males standing on the sidewalk.

15  One of them appears to be working on a white van -- work van.

16  I believe, if I am not mistaken, he was on his knees or

17  crouched down.

18          As Bobby approached the males, the male that was

19  working on the van stands up.  He approached Bobby.  It

20  appeared that they were in conversation and some sort of hand

21  exchange.  Bobby Ramos then turns around, walks back towards

22  Noble Avenue and Lafayette where he met with the undercover.  I

23  observed again another conversation between the undercover and

24  Bobby Ramos.  Moments later they break it off.  They walk their

25  separate ways.  The undercover then gives me the sign that he

L566burH                          Arroyo - direct

1    received drugs from Bobby Ramos.

2              Once the undercover walked back to the vehicle, I

3    advised the team that I needed to do a walk-by where Bobby

4    Ramos was talking to the individual so I can properly, you

5    know -- I can't speak now -- so I can identify the subject he

6    was talking to.  As I approached walking by, I got a chance to

7    look at the individual who was working on the vehicle and also

8    that same individual that engaged in conversation with Bobby

9    Ramos and I told the team positive that the individual that

10   Bobby was talking to was in fact Jonathan Burgos.

11   Q.  Now, at the time of that buy, was Jonathan Burgos known to

12   you from your investigation?

13   A.  Yes.

14              MS. MURRAY:  Mr. Rosenburg, can you please pull up

15   what has been admitted as Government Exhibit 6.

16   Q.  Detective Arroyo, is the white van Burgos working on during

17   the September 13th buy one of the vehicles shown in this

18   photograph?

19   A.  Yes.

20   Q.  Which one?

21   A.  The left white work van.

22   Q.  You testified that you observed Burgos driving that white

23   van during your investigation.  Did you observe anyone other

24   than Burgos driving that white van?

25   A.  No.

L566burH                        Arroyo - direct

1    Q.  Do you have a recollection of whether there was a license

2    plate on that white van on September 13th, 2018?

3    A.  No.

4    Q.  Do you recall having recorded a license plate for that

5    white van on September 13th, 2019?

6    A.  Repeat, please.

7    Q.  Do you recall having recorded a license plate number for

8    the white van on September 13th, 2019?

9    A.  No.

10   Q.  Do your reports relating to that buy include any license

11   plate information for that white van?

12   A.  No.

13   Q.  Do you have a specific recollection of having searched for

14   the registration of that white van in law enforcement

15   databases?

16   A.  No.

17   Q.  Do you have any other identifying information about that

18   white van in your files?

19   A.  No.

20   Q.  To recap, during your investigation approximately how many

21   vehicles did you observe Burgos driving?

22   A.  Approximately five.

23   Q.  Approximately how many of those vehicles were white?

24   A.  Three.

25   Q.  For how many of those vehicles did you run registration

L566burH                    Arroyo - direct

1    searches?

2    A.   Two.

3    Q.   Detective Arroyo, did there come a time when you prepared

4    to arrest members of the crew?

5    A.   Yes.

6    Q.   Approximately when was that?

7    A.   Early -- early 2020.

8    Q.   Who were you preparing to arrest?

9    A.   Jonathan Burgos, Tyrone Howard, Bobby Ramos, Odalys.

10   Q.   Did you work with a prosecutor to prepare a charging

11   document?

12   A.   Yes.

13   Q.   What type of charging document?

14   A.   Complaint.

15   Q.   Do you recall having discussed the complaint with the

16   prosecutor as it was being prepared?

17   A.   Yes.

18   Q.   Do you recall the prosecutor asking you whether the white

19   car referenced in the September 13th, 2019, report was

20   registered to Burgos?

21   A.   Yes.

22   Q.   Do you recall having said that the white car was registered

23   to the Burgos?

24   A.   Yes.

25   Q.   Did you write the complaint?

L566burH                    Arroyo – direct

1   A.  No.

2   Q.  Did you read a draft of the complaint before swearing it

3   out?

4   A.  Yes.

5   Q.  Do you have a specific recollection of reading language in

6   the complaint saying that the white car Ramos pointed out

7   during the September 13th, 2019, buy was registered to Burgos?

8   A.  Yes.

9   Q.  Detective Arroyo, looking at Government Exhibit 6, is the

10  white car referenced in the complaint one of the vehicles shown

11  in this photograph?

12  A.  Yes.

13  Q.  Which one?

14  A.  White van.  White work van.

15          MS. MURRAY:  Thank you, Mr. Rosenburg.  You can take

16  that down.

17  Q.  Detective Arroyo, do you review criminal complaints to

18  ensure their accuracy before swearing them out?

19  A.  Yes.

20  Q.  Do you review warrants to ensure their accuracy before

21  swearing them out?

22  A.  Yes.

23  Q.  Did there come a time when you learned that the statement

24  in the complaint about the white car's registration was

25  inaccurate?

L566burH                      Arroyo - direct

1    A.   Yes.

2    Q.   Approximately when did you come to learn that?

3    A.   March.

4    Q.   Of what year?

5    A.   2020.

6    Q.   How did you learn the information --

7              MR. RUHNKE:  I didn't hear that.

8              Did you say 2020?

9              THE WITNESS:  Yes.

10             MR. RUHNKE:   Thank you.

11   Q.   How did you learn the information about the registration

12   was inaccurate?

13   A.   I received a call from you asking for registration

14   information in regards to that white vehicle.

15   Q.   What did you do when you were asked for registration

16   information for that white car referenced in the complaint?

17   A.   I went back to reading the reports looking at those and

18   which at that point I realized I did not have anything in

19   regards to that white van.

20   Q.   Detective Arroyo, what, if anything, was happening

21   personally around the time of that request for the registration

22   information that may have affected your ability to respond to

23   the request?

24   A.   I was battling COVID-19.

25   Q.   Did there come a time you were hospitalized for COVID-19?

L566burH                       Arroyo - direct

 1   A.  Yes.

 2   Q.  For approximately how long?

 3   A.  Three weeks.

 4   Q.  After you recovered, did you return to work?

 5   A.  Yes.

 6   Q.  Did you search your case files for information about the

 7   white car registration when you returned to work?

 8   A.  Yes.

 9   Q.  What, if anything, did you find?

10   A.  I did not find anything.

11   Q.  In your case files did you find registration information

12   for any of the cars that you observed Burgos driving?

13   A.  Yes.

14   Q.  Which cars were those?

15   A.  White box truck and the Nissan -- gray Nissan.

16   Q.  Detective Arroyo, why did you swear to language in the

17   complaint about the white car being registered to Burgos?

18   A.  So when I read the complaint, I misread that section of the

19   complaint.  I was -- I believe that what I was reading was --

20   should have stated is Jonathan Burgos the owner of the vehicle

21   versus what I read -- what was actually on the report, which

22   said registered.

23   Q.  So at the time you swore out the complaint, did you have an

24   understanding of Burgos's affiliation with that white car?

25   A.  Yes.

L566burH                          Arroyo - cross

1   Q.   How did you have that understanding?

2   A.   The CI.

3   Q.   What was your understanding?

4   A.   The CI stated that Jonathan Burgos is the owner of that

5   vehicle, that he uses it for work.

6   Q.   During your investigation, did you observe Burgos also

7   driving that white van?

8   A.   Yes.

9          MS. MURRAY:  Nothing further, your Honor.

10          THE COURT:  Mr. Ruhnke.

11          MR. RUHNKE:  I apologize, your Honor.  I needed a

12   moment to locate something.

13          THE COURT:  Again, take your time.

14   CROSS-EXAMINATION

15   BY MR. RUHNKE:

16   Q.   Detective, I want to start with discussing your testimony

17   before the United States grand jury that returned the

18   indictment in this case.

19          Do you recall testifying in the grand jury?

20   A.   Yes.

21   Q.   The date of your testimony is 1-4-2020.

22          Detective, do you recall being asked in the grand jury

23   about the undercover buy that you just described in September

24   of 2019?

25          THE COURT:  Hang on a second, Detective.

1          I am going to ask you to speak up a little bit and

2     pull the mic closer.

3          MR. RUHNKE:  Your Honor, is that better?

4          THE COURT:  That's much better.

5     Q.  Directing you to the buy in September 25, 2019.

6          You say that you observed that buy; is that correct?

7     A.  Yes.

8     Q.  Did you also tell the grand jury at that time that law

9     enforcement had investigated the ownership of the white car

10    that was utilized allegedly by Mr. Burgos on that date?

11    A.  Yes.

12    Q.  Did you testify as follows, and I quote:

13    "Q.  What, if anything, were you able to determine about that

14    car?

15    "A.  We were able to determine that the vehicle was registered

16    to Jonathan Burgos."

17         Do you recall giving that testimony under oath before

18    the grand jury?

19    A.  Yes.

20    Q.  Was that true?

21    A.  Yes.

22    Q.  It's true that you found out that the vehicle was

23    registered to Jonathan Burgos?

24    A.  No.

25    Q.  So that was not true, was it?

L566burH                     Arroyo - cross

1   A.  The way registration to me meant ownership.  So I was just

2   confused with registration from ownership at the time.

3   Q.  Okay.  I am going to try to locate the language.

4          You did not refer to the grand jury to the vehicle as

5   being a white van, did you?

6   A.  I don't recall.

7          MR. RUHNKE:  Can we have a stipulation, your Honor,

8   that he never referred to the grand jury as a white van?

9          MS. MURRAY:  I'd have to the look at the transcript

10  before I can stipulate to that.

11  Q.  I direct your attention to the affidavit that you swore out

12  in this case.

13         Do you have a copy of that in front of you?

14         Can we give him a copy of the complaint and the

15  affidavit that was sworn?

16         It's judicially noticeable, your Honor.

17         THE COURT:  You should have it in the 3500.

18         MR. RUHNKE:  Yes.

19         THE COURT:  It is 3500 what?

20         MS. MURRAY:  Yes, your Honor, it's --

21         THE COURT:  3500-01-46 is the complaint.

22         MS. MCLEOD:  That's a draft.

23         THE COURT:  I am sorry.  This is a draft of the

24  complaint.

25         MS. MURRAY:  Your Honor, I have a hard copy of the

L566burH                    Arroyo - cross

1    filed complaint from the briefing in this matter, which was

2    filed at Docket No. 89-1.

3              THE COURT:  Okay.

4    BY MR. RUHNKE:

5    Q.  I have on the screen the *Jencks* material.

6              Do you see that in front of you?

7              THE COURT:  This is not the signed version I am told.

8    Is there a difference between this one and the signed version?

9              MR. RUHNKE:  I have a signed copy, 20 Magistrate 137

10   docketed.  The *Jencks* one is not signed.

11             MS. MURRAY:  Do you want me to give the witness the

12   signed copy?

13             MR. RUHNKE:  Yes.

14             THE COURT:  You are giving him a copy of the signed

15   version of the complaint?

16             MS. MURRAY:  That's correct.  This is Docket 89-1.

17             THE WITNESS:  Thank you.

18   BY MR. RUHNKE:

19   Q.  Do you have that in front of you, Detective?

20   A.  Yes.

21   Q.  Would you look at page 4 of the complaint, paragraph F.

22   A.  Okay.

23   Q.  I am going to read that into the record.  You tell me

24   whether I have read it accurately.

25             *On or about September 13, 2019, Undercover* 3 *met with*

L566burH                    Arroyo - cross

1   *Ramos in the vicinity of the complex to purchase narcotics.*

2   *During the meeting, Ramos identified a white car(Car-1) from*

3   *which Ramos stated he was going to retrieve the narcotics.*

4   *Ramos then left UC 3 and returned with approximately five*

5   *glassine envelopes, which Ramos sold to UC 3.  The contents of*

6   *those envelopes tested positive for the presence of cocaine.*

7           *Based on my review of law enforcement databases, I*

8   *have learned that Car-1, i.e., the car from which Ramos*

9   *retrieved the cocaine and sold to UC 3 was registered to*

10  *Burgos, and that law enforcement has surveilled Burgos driving*

11  *Car-1 in the vicinity of the complex.*

12          Did I read that accurately?

13  A.  Yes.

14  Q.  Did you swear under penalties of perjury that that

15  statement was true?

16  A.  Yes.

17  Q.  Is it true?

18  A.  No.

19  Q.  This is very specific, Detective, I respectfully suggest.

20  You said that you personally -- your review of law enforcement

21  databases.  What law enforcement databases did you review that

22  showed you the car was registered to Burgos?

23  A.  The law enforcement databases that I reviewed were the

24  white box truck and the Nissan that was registered to his

25  girlfriend.  When I ran that last part of this section, I just

L566burH                    Arroyo - cross

1   simply made a mistake, registered.  The way I saw it it was
2   owned instead of the word registered.  It was just a mistake.
3   Q.  You said you reviewed law enforcement databases and that
4   the vehicle was registered to Jonathan Burgos.  That is just
5   false; correct?  That is not true?
6   A.  No.  There are vehicles that I had in my case file that
7   were registered to Jonathan Burgos.
8   Q.  So that statement is false?
9   A.  That Section of F, yes.
10  Q.  All right.  I am going to display (unintelligible).
11          THE COURT:  I did not understand a word you said.  I
12  don't know if the court reporter did or not.
13          MR. RUHNKE:  I am sorry?
14          THE COURT:  I did not understand a word you just said.
15  I don't know whether the court reporter did or not.
16          MR. RUHNKE:  I am just going to display some exhibits,
17  your Honor.  I have to step away.
18          THE COURT:  Okay.
19          MR. RUHNKE:  I will have to be over here.
20          THE COURT:  You have to keep your mask on.
21          MR. RUHNKE:  Can you hear me?
22          THE WITNESS:  Yes.
23          MR. RUHNKE:  Sorry.
24  BY MR. RUHNKE:
25  Q.  I am just going to display a series of documents.

1          Is that the ice cream truck that you say you observed?

2          THE COURT:  This is Defense Exhibit 1.

3   Q.  Defense Exhibit 1.

4   A.  Yes.

5   Q.  Defense Exhibit 2, is that the box truck that you stated

6   you had observed?

7   A.  Yes.

8   Q.  Defense Exhibit 3, is that the gray Nissan you stated you

9   observed?

10  A.  Yes.

11  Q.  Defense Exhibit 4, we've seen this photo before.

12          Now, the white van that is parked there, you described

13  it as a white van; right?

14  A.  Yes.

15  Q.  In the grand jury testimony and in the sworn affidavit, you

16  never refer to a white van; correct?

17  A.  I don't recall.

18  Q.  Well --

19          MS. MURRAY:  Your Honor, the government can stipulate

20  that Detective Arroyo referred to that white van in the grand

21  jury as a "white car" and as a "white vehicle."

22  Q.  I am looking at a document, which is Defense Exhibit 5,

23  which is a report of your interviews with -- sorry.  It's a

24  report of the actual buy on that particular date.  This is on

25  September -- sorry.  Let me just look at the date.  It's

L566burH                        Arroyo - cross

1    September 13th, 2019.

2            This is the report of the undercover buy we've been

3    talking about; correct?

4    A.  Yes.

5    Q.  This is not your --

6            THE COURT:  Wait a second.  I thought this was a March

7    19th buy.  Did I invert the numbers?

8            MS. MURRAY:  It was a September 13th, 2019, buy, your

9    Honor.  The overdose deaths occurred in March 2019.

10           THE COURT:  I am sorry.  Say that again.

11           MS. MURRAY:  Sure.  The buy in question was on

12   September 13th, 2019.

13           THE COURT:  Okay.  Either you misspoke, or I inverted

14   the numbers.

15           So the undercover buy that you testified about

16   occurred on September 13th, 2019?

17           THE WITNESS:  Yes.

18   BY MR. RUHNKE:

19   Q.  This report in evidence talks about a white vehicle;

20   correct?

21   A.  Just give me one second.  Let me read the report.

22           Yes.

23   Q.  In your grand jury testimony, you never refer to the

24   vehicle as a van; correct?

25   A.  No.

L566burH                      Arroyo - cross

1    Q.  No, I am not correct; or no, you never refer to it as a

2    van?

3    A.  No, I never refer to it as a van.

4    Q.  Thank you.

5         MR. RUHNKE:  Some of the discovery that has been

6    produced to us includes law enforcement registration checks,

7    and I would ask the government if they would not mind

8    displaying Government Exhibit 1.

9    Q.  Now, you testified that you had run some registration

10   checks at some point; correct?

11   A.  Yes.

12   Q.  Looking at Government Exhibit 1, do you recall what the

13   date was of this data check?

14        If you look in the upper right-hand corner, it will

15   give you the answer.

16   A.  April 4.

17   Q.  Of 2020?

18   A.  2020.

19   Q.  That was after you swore your affidavit in support of the

20   plea, after the grand jury testimony, and after the indictment

21   had been returned in the case; correct?

22   A.  Yes.

23   Q.  So this was not part of your pre-complaint, pre-indictment

24   investigation; correct?

25   A.  Yes.

L566burH                        Arroyo - cross

1    Q.  Let's go to Government Exhibit 2.

2            This again is another motor vehicle check?

3            MR. RUHNKE:  It's in evidence, your Honor.

4    Q.  It's another motor vehicle check on April 14th, 2020;

5    correct?

6    A.  Yes.

7    Q.  Let's go to Government Exhibit 3.

8            Again, April 4th, 2020.  Motor vehicle check run by

9    you after anything in terms of indictment and complaint and

10   arrests had taken place; correct?

11   A.  Yes, the checks were run by me.

12   Q.  But run by someone on those dates?

13   A.  Yes.

14   Q.  It is part of your case file; right?

15   A.  Yes.

16   Q.  The same thing is true with regard to Government Exhibit 3?

17           THE COURT:  You need to talk slower and louder.

18           MR. RUHNKE:  Okay, your Honor.

19           THE COURT:  Okay.

20           MR. RUHNKE:  Just getting used to the system.

21           THE COURT:  I know.  It sucks.  There is no other way

22   to put it.  I hate it.  There is no point having a hearing if I

23   cannot hear you and understand you.

24           MR. RUHNKE:  I am sorry.

25           THE COURT:  Ditto with the witness.

L566burH                        Arroyo - cross

1              MR. RUHNKE:  Your Honor, I never had a judge complain

2        about my not talking loudly enough.

3        Q.  So is there anywhere, Detective, in your file any evidence

4        that you ran motor vehicle checks prior to the complaint being

5        filed?  Any record or any documentation?

6        A.  I don't recall.

7        Q.  Well, do you have any that you remember?

8        A.  I remember the white box truck.  I remember the Nissan.  I

9        remember several other vehicles with temporary plates that did

10       not come back to any record on file because we were unable to

11       determine those temporary plates.

12       Q.  You testified also regarding your interaction with an

13       undercover confidential informant; correct?

14       A.  Yes.

15             THE COURT:  Wait a minute.  Undercover?

16             MR. RUHNKE:  I am sorry.

17       Q.  A confidential informant; correct?

18       A.  Yes.

19       Q.  What is that person's background in terms of criminal

20       history?

21       A.  I don't recall.

22       Q.  Does the person have prior felony convictions?

23       A.  I don't recall.

24       Q.  Is the person serving as a confidential informant for

25       money?

L566burH                      Arroyo - cross

1  A.  Yes.

2  Q.  How much money has this person been paid by the state of

3  New York, New York Police Department?

4  A.  $200.

5  Q.  Is that by you?

6  A.  Yes.

7          THE COURT:  Is that total?

8          THE WITNESS:  No.  That's not total.

9  Q.  What is the total?

10  A.  That -- I don't recall the total.

11  Q.  This was a full-time paid confidential informant, someone

12  giving you information for money; right?

13  A.  Correct.

14          MR. RUHNKE:  Can I have Government Exhibit 8.

15  Q.  Is this a report, Detective, that you filed; correct?

16  A.  Yes.

17  Q.  This deals with your interaction with the confidential

18  informant; correct?

19  A.  Yes.

20  Q.  It has information about vehicles that Jonathan Burgos

21  owns; correct?

22  A.  Yes.

23  Q.  What is the date of this report?

24  A.  October -- October 1st, 2019.

25  Q.  October 1, 2019; correct?

L566burH                    Arroyo - cross

1   A.  Yes.

2   Q.  In this Detective Division 5D5 report, he provided

3   information that I am going to quote:  "John John has a new box

4   truck and has been driving around with the license plate

5   number," and there is a number given.  "The vehicle can be found

6   parked around Noble Avenue."

7           MR. RUHNKE:  Let me go to the next exhibit.  Let me

8   have Government Exhibit 9.

9   Q.  Government Exhibit 9 is another report that you prepared;

10  correct?

11  A.  Yes.

12  Q.  This has to do with information that this confidential

13  informant gave you regarding certain vehicles; correct?

14  A.  Yes.

15  Q.  There is a reference to a box truck and a Nissan Xterra;

16  correct?

17  A.  Yes.

18  Q.  There is a reference to an ice cream truck and that is in

19  paragraph 1; correct?

20  A.  Yes.

21  Q.  In paragraph 2 now you say you did run a registration check

22  and it came back to Rachel Ocasio for the box truck; correct?

23  A.  Yes.

24  Q.  The Nissan Xterra also Rachel Ocasio, and the Xterra is

25  gray in color; correct?

L566burH                      Arroyo - cross

1    A.  Yes.

2    Q.  Is there any description at all of a white van in any of

3    the information given to you or at least reported by you in

4    these documents?  In reference to a white van?

5    A.  In this one document, yes.  Oh, no, in this document

6    particularly.

7    Q.  Is there any document where the confidential informant

8    discloses to you a white van?

9    A.  No.

10   Q.  When did the white car become a white van?

11   A.  The white car?  The white car -- we consider a white car a

12   white van.  It's a vehicle.  White vehicle.  We consider it all

13   the same.

14   Q.  So if you talk about a white van, you are being specific.

15   If you are talking about an ice cream truck, you are being

16   specifically.  If you are talking about a box truck, you are

17   being specific.

18          Your statement to the grand jury and in your sworn

19   complaint, which you acknowledge is was wrong, inaccurate and

20   false, was that he was driving a white car registered to.

21          Am I summarizing that accurately?

22   A.  According to my grand jury minutes, I did mention white

23   vehicle.

24   Q.  But you also said white car?

25   A.  But I said white vehicle also and I said car in that same

1   sentence.

2   Q.  You never said anything about white van?

3   A.  No.

4   Q.  No, you did not?

5   A.  No.

6   Q.  You would agree with me that you never said anything about

7   white van?

8            MS. MURRAY:  Objection, your Honor.  Asked and

9   answered.

10           THE COURT:  The answer is, yes, he did not say the

11  white van?

12  Q.  You did not say white van; right?

13  A.  No, just white vehicle.

14           MR. RUHNKE:  I think it's clear.

15           I have nothing further, your Honor.

16           THE COURT:  Thank you.

17           Any redirect, Ms. Murray?

18           MS. MCLEOD:  Can you give us one second, your Honor?

19           THE COURT:  Of course.  Take your time.

20           MS. MURRAY:  Just briefly, your Honor.

21           Mr. Rosenburg, can you please publish what is in

22  evidence as Government Exhibit 9.

23  REDIRECT EXAMINATION

24  BY MS. MURRAY:

25  Q.  Detective Arroyo, defense counsel just asked you a few

L566burH                          Arroyo - redirect

1    questions about this report.

2              What is the date of this report?

3    A.  December 17th, 2019.

4              MR. RUHNKE:  I didn't hear the answer.

5    A.  December 17th, 2019.

6    Q.  Can you remind us approximately when the complaint was

7    sworn out in this case?

8    A.  I don't recall.

9    Q.  I believe you have the complaint in front of you, Detective

10   Arroyo, if it would refresh.

11   A.  March.  Sorry, one second.

12             February 3rd, 2020.

13   Q.  Looking again at Government Exhibit 9, which is a

14   December 17th, 2019, report --

15   A.  Yes.

16   Q.  -- what does this report reflect about whether you

17   conducted registration checks for vehicles you had observed

18   Burgos driving?

19   A.  The registrations?

20   Q.  Yes.

21   A.  Yes.

22   Q.  What does this reflect about whether you had been

23   conducting registration checks on December 17, 2019, for

24   vehicles that you had observed Burgos driving?

25   A.  I observed -- these registrations were checked prior to the

L566burH                       Arroyo - redirect

1    complaint.

2              MS. MURRAY:  Nothing further.

3              Thank you, your Honor.

4              MR. RUHNKE:  I have nothing further, your Honor, on

5    recross.

6              THE COURT:  I am sorry.  I think I missed the point of

7    your last question.

8              Does this reflect that there were runs of the

9    registrations of those vehicles?

10             MS. MURRAY:  Yes, paragraphs 2 and 3.  That's what Mr.

11   Ruhnke had inquired into on cross-examination.  Mr. Ruhnke had

12   just not inquired into the date that these registration checks

13   had been run.

14             THE COURT:  Yes, but paragraph 2 says that the CI

15   stated that the owner of the vehicle -- it's poorly worded.

16   The CI is saying it is registered to whomever.  I thought your

17   question was whether he had run registration checks.

18             MS. MURRAY:  Yes, your Honor.  I think you might be

19   looking at Government Exhibit 8.

20             THE COURT:  Yes, I am.

21             MS. MURRAY:  Government Exhibit 9 is the exhibit I

22   just inquired.

23             THE COURT:  Okay.  I was looking at the wrong exhibit.

24             Mr. Ruhnke, did you have any further?

25             MR. RUHNKE:  Nothing further.

L566burH                    Arroyo - redirect

1           THE COURT:  Nothing further from the government?

2           MS. MURRAY:  No, your Honor.

3           THE COURT:  Thank you.

4           I have a question.

5           When were you diagnosed with COVID?

6           THE WITNESS:  I was diagnosed with COVID April 1st.  I

7    was in the hospital for three weeks.  I didn't come back until

8    April 28th, I believe.  I was unable to return full duty to

9    work until June 1st.

10          THE COURT:  How long were you sick before you were

11   hospitalized?

12          THE WITNESS:  I was sick -- I tried to fight it out a

13   week before.  I couldn't breathe.  I wasn't breathing.  A week

14   into the hospital, I was put on oxygen.

15          THE COURT:  Okay.  I am just trying to figure out when

16   you got sick.

17          Are you okay now?

18          THE WITNESS:  Yes, perfect.

19          THE COURT:  Good.  Well, as perfect as ever.

20          You may step down.

21          (Witness excused)

22          THE COURT:  Anything further from the government?

23          MS. MURRAY:  No, your Honor.

24          THE COURT:  Does the defense have anything?

25          MR. RUHNKE:  Nothing additional, your Honor.

1            THE COURT:  The hearing is closed.

2            Does the government want to argue it?

3            MS. MURRAY:  Just a moment, your Honor.

4            We would like to briefly argue, your Honor, if I could

5    have a few minutes.

6            THE COURT:  Of course.  Why don't we break for five

7    minutes and you can get your thoughts together.

8            MR. RUHNKE:  Thank you, your Honor.

9            (Recess)

10           THE COURT:  Ms. Murray.

11           MS. MURRAY:  Your Honor, would the Court like us to

12   excuse the witness before we do argument?

13           THE COURT:  Yes, I probably should.  If the case goes

14   forward, he will be a witness.

15           Detective, out into the hallway you go.

16           THE COURT:  Okay.

17           MS. MURRAY:  Your Honor, just briefly.

18           Law enforcement observed Jonathan Burgos driving

19   multiple cars during the course of their investigation; and

20   Detective Arroyo did run registration checks of some of those

21   cars prior to having sworn out the complaint, and two of the

22   cars specifically came back to Jonathan Burgos's girlfriend.

23           Detective Arroyo confused the concept of ownership

24   with registration.  There is no evidence that this was

25   deliberate.  In fact, the evidence that the detective had in

L566burH                    Arroyo - redirect

1    addition to the registration of that car was as probative of

2    probable cause as the registration.  He had information from a

3    confidential informant that had been corroborated.

4              THE COURT:  I am going to ask you to really slow down.

5              MS. MURRAY:  I am sorry.

6              THE COURT:  The acoustics in this room are terrible.

7    It is not that ya'll can hear.  From my perspective, it is very

8    difficult to hear particularly when you are in the box.

9              MS. MURRAY:  Understood.

10             The last point I made, your Honor, there is no

11   evidence that this was deliberate because the evidence that

12   Detective Arroyo had was as probative of probable cause as to

13   Jonathan Burgos as the registration information for this van.

14             THE COURT:  That wasn't included.

15             MS. MURRAY:  That wasn't included in the complaint.

16   That is correct, your Honor.

17             Defense counsel's points on cross-examination are

18   nitpicking on terms.  Car versus vehicle versus van.  Detective

19   Arroyo didn't invent the white van.  He saw a photo of the

20   white van and a white box truck and a white ice cream truck.

21   There were simply multiple white cars.  This is one isolated

22   statement that the detective believed was accurate.  He

23   believed the phrasing was accurate at the time, which is why he

24   also testified about this in the grand jury.  And then when was

25   asked in March of 2020 for records of registration, he didn't

1    lie.  He said he looked through his file and he had no records

2    of the registration, and he described it as a mistake.

3            For those reasons, your Honor, we ask that the Court

4    finds that there was no deliberate falsehood or reckless

5    disregard for the truth in the statement in the complaint.

6            MR. RUHNKE:  Let me know, please, if I cannot be heard

7    or I am not speaking clearly.  This is all very difficult.

8            THE COURT:  I know.

9            MR. RUHNKE:  Your Honor, at the very best the

10   detective's assertion of having run a registration check

11   personally of Jonathan Burgos's car was reckless.  We're

12   limited to what is in the affidavit and the complaint in terms

13   of the motion to suppress, and it is telling that the affidavit

14   that he submitted makes no mention whatsoever of having

15   quote/unquote ghosting this undercover buy, having gone by the

16   white van, having personally identified Jonathan Burgos as

17   driving the white van on that day.  There is nothing in the

18   complaint, affidavit that matches that.

19           It is specific.  The language that he uses is not just

20   I learned.  He says -- and I am referring to the 3500 exhibit,

21   which your Honor has at page 4, paragraph F -- *I have learned*

22   *that Car-1, i.e., the car from which Burgos retrieved the*

23   *cocaine and sold to UC 3 was registered to Burgos, and that law*

24   *enforcement has surveilled Burgos driving Car 1 in the vicinity*

25   *of the complex.*  There is no mention of who or where or when

1    that happened.

2              I think it's frankly absurd to argue he was mixing up

3    the word "registration" and "ownership" and that by describing

4    a car when he really meant a van he was using the word vehicle.

5    The best statement on this is this was a reckless disregard for

6    the truth, and I believe there is evidence this was just a

7    flatout lie to make the complaint and the affidavit stronger

8    than it was.

9              You have a suggestion that a crew was dealing --

10             THE COURT:  Say that again.

11             MR. RUHNKE:  All we have is that there was some crew

12   of people dealing drugs in the affidavit.  None of the detail

13   that he provided today is in the affidavits that support this

14   complaint and the searches.

15             THE COURT:  That's true, but I think everybody agrees

16   that my chore is to decide whether the inaccuracy in the

17   complaint was a result of a deliberate falsehood or reckless

18   disregard.  Deliberate falsehood doesn't make any sense because

19   they had all kinds of evidence that was at least as persuasive

20   as the car registration.

21             Right?

22             MR. RUHNKE:  No, your Honor, the evidence is just

23   general.

24             THE COURT:  Well, wait a minute.  Maybe I

25   misunderstood him or maybe you didn't hear him.  The detective

testified that as the ghost he observed Ramos talk to the

undercover who is purchasing drugs, break away from him, walk

over to the white vehicle where Ramos -- I am sorry -- where

Burgos was.  Burgos and Ramos then have a conversation.  There

was a pass of something, presumably narcotics.  Ramos then

walks back to the undercover, gives him the drugs and he gets

the money; and that the ghost saw all of that and that the

ghost then walks past the set where the vehicle and the four

men, including Mr. Burgos, were; confirmed that the person he

saw hand the package to Ramos was in fact Burgos.  He knew from

the investigation.  Presumably he had seen a picture of him.

         That is compelling evidence that would name Mr. Burgos

as a participant in the drug organization.

         MR. RUHNKE:  Compelling if true.  Compelling if true.

         None of that appears in any report prepared by this

detective.  The information does not appear in the affidavit

that your Honor is scrutinizing.  I am wondering when the first

time is that he told anybody that he had walked over there

looking at the notes that were prepared as part of the *Jencks*

production in this case, which we mostly got late yesterday

afternoon.  It appears that it has been as recently as prep for

this suppression hearing that the first time he ever told

anybody.

         Why in the world wouldn't you report that activity if

it actually happened is beyond me, your Honor.  It's strange.

1    The point is none of it is in the affidavit.  This is all just

2    after the fact.

3              THE COURT:  That's true.  The purpose of the hearing

4    is to make a decision whether the inaccurate statement in the

5    complaint was deliberately put in.  So if I credit his

6    testimony that I just layed out -- he was the ghost, that is

7    what he saw -- you would agree if that is credited the notion

8    that this was a deliberate falsehood makes no sense.  They had

9    more than enough probable cause.

10             MR. RUHNKE:  It makes no sense to not include that

11   information in any of the key reports that he filed.  I suggest

12   respectfully he may have made that up.

13             THE COURT:  You're quarreling with my premise.

14             I am asking you to assume for these purposes that I

15   credit his testimony -- (A) that he was a ghost and (B) what he

16   saw.  If I credit that testimony, do you agree that the idea

17   that this was a deliberate falsehood does not make sense?

18             MR. RUHNKE:  I disagree.

19             THE COURT:  Why?  Now, don't quarrel with my premise.

20             MR. RUHNKE:  I accept your premise.

21             THE COURT:  Okay.

22             MR. RUHNKE:  I believe he had a lot more information

23   that he somehow didn't share with anybody despite its obvious

24   importance.  I believe that is true.  It still doesn't change

25   the fact that he deliberately or recklessly stated that he had

L566burH                    Arroyo - redirect

1    searched law enforcement databases and that the vehicles was

2    registered to Burgos when that was conceivably a false

3    statement.  That's my position.

4              THE COURT:  All right.  I hear you.

5              There is a third possibility, which is that he was

6    negligent, that he was relying on his memory in February for

7    something that had occurred in September.  So because he had

8    observed Burgos driving the white van and he had run other

9    registration tags on other cars that Burgos drove that in his

10   head he had confirmed Burgos was the driver of that vehicle and

11   therefore he was negligent when he presumably told prosecutors

12   and signed the affidavit saying that he had confirmed that

13   Burgos was the registered owner of the white vehicle from which

14   the drugs were obtained.

15             MR. RUHNKE:  That's not what he says.  He says in the

16   complaint based on my review of law enforcement databases, I

17   have determined that.  That's his statement.  He is not saying,

18   I don't recall what happened.  He is saying, I did that.  I

19   reviewed law enforcement databases and I learned that the white

20   car was registered to Burgos –- a false statement, a detailed

21   statement.

22             It is not just I learned from a source.  It's:  I

23   learned from law enforcement databases.  He is not saying he

24   was told by someone.  He is saying, I learned from law

25   enforcement databases.  That is not a failure of memory.  That

L566burH                    Arroyo - redirect

1   is a deliberate lie respectfully.

2              THE COURT:  Okay.

3              MR. RUHNKE:  Thank you, your Honor.

4              THE COURT:  Anything else?

5              MR. RUHNKE:  No.

6              THE COURT:  Ms. Murray.

7              MS. MURRAY:  Yes, your Honor.  Just on your point

8   about if you were to credit the detective's testimony that this

9   would not be a deliberate falsehood, we completely agree.  This

10  would be an absurd thing to lie about deliberately because it

11  is a proveable fact.  It is verifiable.  Registration

12  information is verifiable.

13             As your Honor noted in the oral argument before this

14  hearing, the complaint is inartully worded.  We concede that

15  certainly.  But as your Honor heard during testimony today,

16  there was ample probable cause as to Jonathan Burgos, including

17  from this particular buy.

18             THE COURT:  Even if I agree that it's not a deliberate

19  falsehood, because it doesn't make any sense there would be a

20  deliberate falsehood if I credit the balance of the testimony,

21  the question is whether it rises to the level of recklessness.

22             MS. MURRAY:  Yes, your Honor.

23             To that point, I would note it is an isolated instance

24  of inaccurate information.  The second part of that sentence is

25  accurate, that law enforcement did observe Burgos driving the

L566burH                           Arroyo - redirect

1   car in the vicinity of the complex.  It's the specific question

2   about registration of the car.  As Detective Arroyo testified

3   and as the report support, he did run registration checks.  He,

4   himself.  So to Mr. Ruhnke's point about I searched law

5   enforcement databases, he did search law enforcement databases

6   including for a particular white vehicle and he found that it

7   was registered to someone with a close affiliation to the

8   defendant.

9            I simply think, your Honor, it was a mistake and I do

10  not believe that this rises to the level of reckless disregard

11  for the truth.

12           THE COURT:  Thank you.

13           Mr. Ruhnke, anything further?

14           MR. RUHNKE:  It's just he was reckless not to check

15  whether he had actually run law enforcement database

16  information before he signed the affidavit under oath and

17  before he testified in the grand jury under oath that he had

18  done those things.  It's at best a reckless false statement at

19  best.

20           Thank you, your Honor.

21           THE COURT:  I am going take this under advisement.

22           Thank you everybody.

23                             o0o

24

25